UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JASON HACKER (#383727)

VERSUS

BURL CAIN, ET AL

CIVIL ACTION

NUMBER 07-204-RET-SCR

**RULING**

Petitioner Jason Hacker filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  On November 9, 2009, an evidentiary hearing was conducted on the first component of Claim 5, specifically, ineffective assistance of counsel for failure to call Eula Jackson and Joseph Jackson as witnesses at the trial.

**Background**

Petitioner was found guilty of two counts second degree murder and one count aggravated burglary in the Nineteenth Judicial District Court for the Parish of East Baton Rouge, Louisiana on March 16, 2002.  Petitioner was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence in the custody of the Louisiana Department of Public Safety and Corrections on each count of second degree murder, with the sentences to be served consecutively.  Petitioner was sentenced to 30 years imprisonment at hard labor on the aggravated burglary count, with the sentence to be served concurrently with the life sentences.

Petitioner's convictions and sentences were affirmed on appeal. *State of Louisiana v. Jason Hacker*, 2002-1474 (La. App. 1st Cir. 4/2/03), 841 So.2d 101 (Table). Petitioner's application for supervisory review was denied by the Louisiana Supreme Court. *State of Louisiana v. Jason Hacker*, 2003-1362 (La. 11/26/03), 860 So.2d 1131.

Petitioner signed his federal habeas corpus application on November 28, 2006, and it was filed on December 20, 2006 in the United States District Court for the Western District of Louisiana. Petitioner raised the following grounds for relief: (1) there was insufficient evidence to support his second degree murder and aggravated burglary convictions; (2) prosecutorial misconduct; (3) introduction of other crimes evidence; (4) his statement was obtained without *Miranda* warning and assistance of counsel; and, (5) he received ineffective assistance of counsel. Petitioner's application for habeas corpus relief was previously denied as to Claims 1 through 4 and as to the second through fourth components of Claim 5.[1]

### Ground 5: Ineffective Assistance of Counsel

In the first component of the petitioner's ineffective assistance of counsel claim he argued that counsel rendered ineffective assistance when they subpoenaed, but then failed to

---

[1] Record document number 27.

-2-

call to testify, two witnesses who would provide an alibi.

## Review of the Evidence

Jason Hacker testified that he arrived at the home of Eula Jackson at approximately 1:25 a.m., on October 11, 1999.[2]  Hacker testified that he stopped at Jackson's home to borrow money in case he ran out of gas before reaching his apartment in Baton Rouge.[3] Hacker testified that Jackson had no money but suggested that he go to Joseph Jackson's home which was around the corner.[4]  Hacker testified that he arrived at Joseph Jackson's home at approximately 1:45 a.m.[5]  Hacker testified that Joseph Jackson told him he did not have any money.[6]

Hacker testified that he was represented by attorneys Susan Henry and Michael Mitchell at trial.[7]  Hacker testified that on several occasions he discussed with counsel his meeting with the Jacksons.[8]  Hacker testified that counsel met with Eula Jackson and Joseph Jackson and told him that the Jacksons would be subpoenaed

---

[2] Evidentiary Transcript, pp. 4-5.

[3] *Id.* at 5.

[4] *Id.* at 6.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

-3-

to testify at trial.[9]   Hacker testified that Eula and Joseph Jackson told his attorneys that the petitioner was with them at the time of the murders.[10]   Hacker testified that Eula Jackson and Joseph Jackson were present at trial but counsel rested without calling them as witnesses.[11]  Hacker testified that he told Mitchell that he wanted to introduce the alibi evidence but counsel rested without presenting any evidence.[12]

Hacker testified that his attorneys questioned the quality of his alibi defense as it related to Myra Flowers.[13]  Hacker testified that he wrote a letter to Flowers in which he indicated that he wanted her to testify that she was with him at a particular time but Flowers testified at trial that he was not with her on the night of the murders and his assertions in the letter were a lie.[14]

Hacker testified that the Jacksons never gave a statement to police that he was with them on the night of the murders.[15]

Joseph Jackson testified that the petitioner worked for him in

---

[9]  *Id.* at 7.

[10]  *Id.* at 17.

[11]  *Id.* at 6, 7.

[12]  *Id.* at 7-8.

[13]  *Id.* at 8.

[14]  *Id.* at 11-12.

[15]  *Id.* at 15-16.

a meat market.[16]  Jackson testified that on the night of the murders
the petitioner came to his home in Gonzales, Louisiana, between
1:30 a.m. and 2:00 a.m. to borrow money.[17]  Jackson testified that
he was asleep when the petitioner arrived.[18]  Jackson testified that
he looked at the clock on his television when the petitioner
arrived.[19]  When asked what the exact time was on the clock when he
looked at it, Jackson conceded that he did not know what time it
was.[20]  Jackson testified that after the petitioner was arrested he
found out that the petitioner had been at his home the night of the
murders.[21]  Jackson testified that about four or five days after the
murders police detectives came to his store and spoke to him.[22]

Jackson testified that he did not prepare the affidavit and
could not recall whether he appeared in person before a notary
public or was sworn before signing the affidavit.[23]

Eula Jackson testified that she told attorney [Michael]
Mitchell that the petitioner came to her home on the night of the

---

[16] *Id.* at 18.

[17] *Id.* at 19.

[18] *Id.* at 21-22.

[19] *Id.* at 22.

[20] *Id.*

[21] *Id.* at 23.

[22] *Id.* at 24.

[23] *Id.* at 25-27.

murders to borrow money and that she sent him to Joseph Jackson's home.[24]

Jackson testified that she was interviewed by district attorneys and told them the petitioner came to her house.[25] Jackson testified that the district attorneys told her that they had their man and that they were not worried about anything.[26]

Jackson testified that she was present at the courthouse and was prepared to testify at trial but was not called.[27]

Jackson testified that she did not give a statement to the police or anyone else following the murders.[28] Jackson testified that she filed the affidavit before the petitioner's trial but later conceded that it was prepared six months after the trial concluded on September 9, 2002.[29]

Susan Henry Hebert testified that she and Michael Mitchell represented the petitioner during the criminal proceedings on charges of second degree murder.[30] Hebert testified that when she first met with the petitioner he identified Eula and Joseph as

---

[24] *Id*. at 29-30.

[25] *Id*. at 30.

[26] *Id*. at 30.

[27] *Id*.

[28] *Id*. at 32-33.

[29] *Id*. at 34-36.

[30] *Id*. at 37-38.

alibi witnesses.[31]  Hebert testified that her investigator initially contacted the Jacksons and on January 31, 2000, she interviewed them at her office.[32]  Hebert testified that the Jacksons told her that the petitioner came to their home in the early morning hours and asked for money.[33]

Hebert testified that the petitioner also identified Myra Flowers as an alibi witness.[34]  Hebert testified that the petitioner told her he met Flowers at Fred's bar on the day of the murders, had sexual relations with her in a field and afterwards went with her to another bar.[35]  Hebert testified that they were trying to locate Flowers to subpoena her as an alibi witness.[36]  Hebert testified that before she was able to locate Flowers, and without her knowledge, the petitioner sent Flowers a letter in which he stated "I need you as my alibi."[37]  Hebert testified that Flowers was troubled by the petitioner's letter and contacted her and the district attorney.[38]  Hebert testified that Flowers testified on

---

[31] *Id.* at 38.

[32] *Id.*

[33] *Id.*

[34] *Id.* at 39.

[35] *Id.*

[36] *Id.*

[37] *Id.* at 39-40.

[38] *Id.* at 40.

behalf of the State.[39]

Hebert testified that the letter the petitioner sent to Flowers was specific as to the time the two supposedly left the bar, had sexual relations in the field, returned to Grace's bar and then left the bar.[40]   Hebert testified that the time period overlapped the time period the petitioner claimed to be with Eula and Joseph Jackson.[41]   Hebert testified that the letter to Flowers stated that he and Flowers were together at Grace's bar until closing time at 2:00 a.m.[42]   Hebert testified that because of this discrepancy and the fact that the case was a circumstantial evidence case with no eyewitnesses, she and Mitchell decided for purposes of trial strategy not to call Eula and Joseph Jackson as witnesses.[43]   Hebert testified that she and Mitchell discussed the decision with the petitioner and he did not fight over the decision and did not advise the court that he wanted to call the Jacksons.[44]

### Findings of Fact

A preponderance of the credible evidence supports the

---

[39] *Id.*

[40] *Id.*

[41] *Id.* at 40-41.

[42] *Id.* at 50.

[43] *Id.* at 41, 51.

[44] *Id.* at 44.

following factual findings.

Eula and Joseph Jackson were interviewed by defense counsel and were subpoenaed for trial. Each would have testified that on the night of the murders the petitioner came to their homes requesting money. Joseph Jackson did not know what time the petitioner arrived at his home. Neither gave a statement to police regarding the petitioner's visit to their home on the night of the murders.

Petitioner sent a letter to Myra Flowers insisting that she provide him with an alibi for the night of the murders and provided her with a specific time line of their activities on that evening. Flowers testified on behalf of the State and denied that she had been with the petitioner on the night of the murders.

Following the introduction of the petitioner's letter to Flowers and her testimony, defense counsel made a conscious and informed decision to not call Eula and Joseph Jackson as witnesses.

## Applicable Law

To obtain habeas relief based upon a claim of ineffective assistance of counsel, the petitioner must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984). To prove deficient performance the petitioner must demonstrate that counsel's actions "fell below

an objective standard of reasonableness." *Id.*, at 688, 104 S.Ct. at 2064; *Williams v. Taylor*, 529 U.S. 362, 390, 120 S.Ct. 1495, 1511 (2000). There is a strong presumption that counsel performed adequately and exercised reasonable professional judgment. *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006). "[A] conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness". *Id.* (internal quotation marks omitted). However, there is a distinction between strategic judgment calls and plain omissions. *See Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992). The court is "not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999).

To prove prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. at 2068. A reasonable probability is "a probability sufficient to undermine confidence in the outcome" and is less than a preponderance of the evidence. *Id.* at 693-94, 104 S.Ct. at 2068; *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 844 (1983)(petitioner required to show that counsel's

deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair). Stated differently, a constitutional trial error is harmful only if there is "more than a mere reasonable possibility that it contributed to the verdict." *Mayabb v. Johnson*, 168 F.3d 863, 868 (5th Cir. 1999).

### Conclusion

The credible evidence established that defense counsel made a conscious and informed decision to not call the Jacksons as witnesses to downplay Flowers' testimony and to avoid the introduction of testimony which would create a discrepancy in the time line of the petitioner's whereabouts on the night of the murders. This was a reasonable trial strategy and therefore cannot amount to ineffective assistance of counsel.

Accordingly, the petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied.

Baton Rouge, Louisiana, *August 16*, 2010.


RALPH E. TYSON, CHIEF JUDGE
MIDDLE DISTRICT OF LOUISIANA